UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

United States of America,

      Plaintiff,               Crim. No. 19-20550

v.                             Hon. Paul D. Borman

Dorian Sykes,

      Defendant.

---

**United States' Response to Defendant's Motion for Compassionate Release Due to Covid-19 Pandemic**

---

In November 2020, this Court sentenced Dorian Sykes to 68 months in prison after Sykes pleaded guilty to bank robbery. (ECF No. 155, PageID.980). At the time, Sykes was just 6 weeks into his term of supervision after being released from prison for the same crime. The sentence was to run concurrent to the sentences in 03-cr-80028 and 04-cr-80623—the two cases where Sykes was on federal supervised release after serving a lengthy sentence after being convicted for bank robbery and perjury. (ECF No.155, PageID.981). Sykes now moves for compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i), citing his fear of

contracting Covid-19 and unsubstantiated allegations of a "HPLORI" [1] outbreak
due to the contaminated water supply at his Bureau of Prisons (BOP) facility, as
grounds for a sentence reduction. (ECF No. 202, PageID.1119). But Sykes has not
satisfied the statutory exhaustion requirement for compassionate release and
therefore his motion should be dismissed. Even if Sykes had properly exhausted
his administrative remedies with the BOP, he still does not qualify for
compassionate release because he does not present an extraordinary and
compelling reason for such relief. First, as to his fear of contracting Covid-19,
Sykes has been fully vaccinated against Covid-19. *See* Exhibit A—BOP
Vaccination Record, *sealed*. Also, "the mere existence of Covid-19 in society and
the possibility that it may spread to a particular prison alone cannot independently
justify compassionate release." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir.
2020). Vaccination aside, Sykes also does not present a medical condition that,
according to CDC guidance, places him at enhanced risk during the current
pandemic. Second, Sykes's claims regarding H. pylori are wholly unsubstantiated,
and even if true, his generalized fear of H. pylori does not present an extraordinary
and compelling reason permitting relief. And if Sykes in fact contracted a H. pylori

---

[1] The United States assumes that Sykes is complaining about Helicobacter pylori,
commonly called H. pylori. *See*
https://wwwnc.cdc.gov/travel/yellowbook/2020/travel-related-infectious-
diseases/helicobacter-pylori.

infection, it would still not qualify him for release since the condition is not a "terminal illness" with an end of life trajectory, or a condition that "substantially diminishes the ability of the defendant to provide self-care" and the defendant "is not expected to recover" from the condition. USSG § 1B1.13 cmt. N.1 (A).

Nonetheless, the danger Sykes still presents to the community, the time remaining on his sentence, and all other considerations under 18 U.S.C. § 3553(a) prevent him from qualifying for compassionate release. Sykes's motion should be denied.

## I.     Background

### A.     Criminal Conduct

On August 12, 2019, at approximately 9:15 a.m., Sykes entered a Citizen's Bank in Warren, Michigan. While seated at one of the customer service desks, Sykes slid the bank teller a demand note and stated, "It's a robbery, don't make it obvious and no one will get hurt. No dye packs." Sykes followed the teller to the front counter, where she removed $1,220.00 in U.S. currency from one of the drawers. Sykes grabbed the money and left the bank.

Later that day, at approximately 3:10 p.m., Sykes struck again. He entered a Comerica Bank in Oak Park, Michigan. Sykes slid a demand note to a teller that stated, "This is a robbery." Sykes also declared, "This is a robbery, give me everything, no packs and don't sound the alarm." The victim teller moved to open

her teller drawer and after not being able to open it quickly enough, Sykes threatened her by saying, "put your hands up" and "don't mess with me." The victim teller instructed another employee to give Sykes money because she could not put her hands down. The employee slid $810.00 in United States currency through the opening at the bottom of safety glass towards Sykes; he grabbed it and left.

Warren Police disseminated a bulletin to area law enforcement agencies that contained bank surveillance photos of Sykes inside the Citizens Bank. On August 13, 2019, Sykes was located and arrested at the craps table at Motor City Casino, wearing the same clothing he had on during the two bank robberies the day prior.

When he robbed the two banks, Sykes had just completed a 17-year prison sentence after being convicted of bank robbery, brandishing a firearm in furtherance of a crime of violence and felon in possession of a firearm (Case No. 03-cr-80028) and perjury (Case No. 04-cr-80623).

In February 2020, Sykes pleaded guilty to one count of bank robbery, in violation of 18 U.S.C. § 2113(a). On November 18, 2020, this Court sentenced Sykes to 68 months in prison concurrent to two supervised release violation cases. (ECF No. 155, PageID.980).

**B.    Defendant's background**

Sykes is a serial bank robber and repeat criminal offender. Sykes's history

paints a troubling and unmistakable picture of a person who has a complete disregard for the law. Both before and after Sykes's 17-year period of incarceration, he repeated a pattern: commit a crime and then violate conditions of release or supervision by committing an additional offense. For example, Sykes received a sentence of probation after being convicted in 1997 as a juvenile of retail fraud and loitering. He violated his probation when he was arrested in January 2001 for possession of a controlled substance under 25 grams. (PSR ¶ 43). He then violated his conditions of bond when he was arrested in April 2001 for receiving and concealing stolen property. (PSR ¶ 43-44). During that arrest, he lied to officers about his age. *Id.* Due to his lies, he was placed in a juvenile holding cell and then attempted to escape. (PSR ¶ 44). For this, he was charged and convicted of resisting and obstructing an officer. *Id.* After serving a 6-month jail sentence, he was released early for entry into a Salvation Army Program. *Id.* Sykes violated and absconded from that program. *Id.* In 2002, Sykes was arrested and convicted for unlawful use of a motor vehicle. (PSR ¶ 45). He was sentenced to 6 to 30 months in custody, followed by a term of probation. He violated the terms of his probation and, while that violation warrant was active, Sykes committed the bank robbery that resulted in this underlying criminal case 03-cr-80023. (PSR ¶ 47). After Sykes pleaded guilty in this underlying case and was awaiting sentencing, he committed perjury by testifying falsely in his co-defendant's trial

resulting in criminal case 04-cr-80623. (PSR ¶ 48).While on federal supervised release in two federal cases, Sykes committed the two bank robberies in this case. Notably, after he was sentenced in this case, Sykes continued his pattern of criminal activity when he pleaded guilty to possessing a cellphone in Genesee County Jail on February 3, 2021. *See* Exhibit B—Genesee County Court Record.

The defendant is currently serving his sentence at USP Coleman II with an anticipated release date of July 7, 2024[2]. He has served less than half of his 68 month sentence. Sykes is only 38 years old, and has no significant underlying medical conditions, and certainly none that are terminal. As it relates to Covid-19, Sykes is vaccinated. Nevertheless, Sykes has moved for compassionate release, citing his generalized fear of the Covid-19 pandemic as well as an unsubstantiated fear of becoming infected with H. pylori. The undersigned obtained the defendant's medical records from BOP, which are filed under seal as Exhibit C. Sykes does not claim any underlying medical conditions that would put him at greater risk should he contract Covid-19 and the records confirm this. He has not been evaluated for H. pylori infection. Nonetheless, because Sykes has not filed a request for compassionate release based upon the Covid-19 pandemic, this Court

---

[2] This is Sykes's projected release date on the BOP public website which is calculated by the automatic awarding of good conduct time at the rate of 54 days per year of sentence imposed. Good conduct time may be taken away from an inmate as a sanction imposed for violating disciplinary rules.

does not have jurisdiction to rule on the current motion. Even if he had, Sykes's fear of contracting Covid-19 and becoming infected with H. pylori does not qualify him for compassionate release.

### C.   BOP's Response to the COVID-19 Pandemic

As the Court is aware, from the moment the pandemic began, the BOP made extensive changes to its operations, based on a plan that was prepared over many years, and refined in early 2020 in consultation with the Centers for Disease Control and the World Health Organization. Those efforts continue.

The government recognizes that the COVID-19 case rate at a particular institution may change at any time. We therefore focus primarily on considerations specific to the defendant. But BOP's success at many institutions in limiting the spread of the virus, and in stemming outbreaks when they occur, provides an important backdrop for the defendant's motion.

BOP's "action plan" is described in detail at www.bop.gov/coronavirus/. As part of that plan, all newly arriving inmates are quarantined and not released into the general population until 14 days have passed and the inmate has tested negative; inmate movement within an institution is restricted in order to promote social distancing; mask wearing by inmates and staff is required; all facility staff are screened for symptoms daily; social visiting has been suspended at nearly all

institutions; and access by other outsiders is restricted to only those performing

essential services, who are also screened before entry.

In addition, acting under the authority granted in the CARES Act, BOP has

transferred many thousands of inmates to home confinement, focusing on

nonviolent offenders who have served the majority of their sentences.[3] This

initiative, combined with the reduced number of new arrivals during the pandemic

and the ordinary release of prisoners upon completion of their sentences, has led to

a dramatic decrease in the total BOP population, which in turn has increased

opportunities for social distancing and reduced the strain on BOP resources. The

total BOP population, which was approximately 170,000 at the beginning of the

pandemic, is now more than 10% lower, at the lowest level in decades.

When an outbreak does occur, any infected inmate is immediately

quarantined, and all contacts (including entire housing units if warranted) are

---

[3]This Court does not have authority to grant a transfer to home confinement, or
review BOP's administrative decision regarding that issue. *See* 18 U.S.C.
§ 3621(b) (BOP's designation decision is not subject to judicial review); *see also,
e.g.*, *United States v. Gray*, 2020 WL 6822949, at *2 (E.D. Pa. Nov. 20, 2020)
(Sanchez, C.J.); *United States v. Rodriguez-Collazo*, 2020 WL 2126756, at *2-3
(E.D. Pa. May 4, 2020) (Younge, J.); *United States v. Pettiway*, 2020 WL
3469043, at *2 (E.D. Pa. June 25, 2020) (Bartle, J.); *United States v. Torres*, 2020
WL 3498156, at *5-6 (E.D. Pa. June 29, 2020) (Kearney, J.); *United States v. Cruz*,
2020 WL 1904476, at *4 (M.D. Pa. Apr. 17, 2020); *United States v. Mabe*, 2020
U.S. Dist. LEXIS 66269, at *1 (E.D. Tenn. Apr. 15, 2020) ("the CARES Act
places decision making authority solely within the discretion of the Attorney
General and the Director of the Bureau of Prisons. . . . This Court therefore does
not have power to grant relief under Section 12003 of the CARES Act.").

tested and quarantined as necessary, until all contacts return at least two negative tests in a two-week period.

All of these strenuous efforts have been fruitful. To be sure, there is no way to stop this virus short of widespread vaccination, and inmates inevitably will be infected and some may succumb, just as in the population at large. But it is notable that the rate of deaths in federal prisons as a whole has been lower than that in the general U.S. population, a notable achievement given the known risks of viral spread in a congregate prison setting.

Specifically as it relates to Sykes, BOP's aggressive efforts have extended to USP Coleman II. That institution houses 1,024 inmates. At present, there is 1 inmate who is reported positive, and is isolated while he is treated/recovering. There are also 372 current inmates who previously tested positive and have recovered. There has been 1 COVID-related inmate deaths at this institution. The latest statistics are available at www.bop.gov/coronavirus (last accessed 9/13/2021).

**D.    Vaccinations**

BOP is working with the CDC and the federal government's COVID-19 Vaccine/Therapeutics Operation (formerly known as Operation Warp Speed) to ensure that BOP receives the COVID-19 vaccine as it becomes available. As of the

week of February 8, 2021, doses of the vaccine had been delivered to every BOP
institution.

BOP offered the vaccine first to full-time staff because staff members—who
come and go between the facility and the community—present a more likely vector
for COVID-19 transmission into an institution. As of this time, vaccines have been
administered to all willing staff members, and BOP continues to encourage staff
members who have not accepted a vaccine to do so. (Staff members may also
obtain and have obtained vaccinations from other providers in the community.)

BOP is now in the process of offering vaccines to inmates, proceeding based
on priority of need in accordance with CDC guidelines. In general, the vaccine is
offered first to inmates over 75 years of age; then to inmates over 65 years of age;
then to inmates of any age who present a condition identified by the CDC as
presenting a risk of severe COVID-19 disease; and then to all inmates. As of this
time, BOP has administered a total of 220,912 doses to staff and inmates
nationwide. At USP Coleman II,  BOP has fully vaccinated 755 inmates (which is
74% of the current inmate population, and does not account for those additional
inmates who declined vaccination). The clinical guidance provided to BOP health
services professionals is available at

https://www.bop.gov/resources/pdfs/covid19_vaccine_guidance_20210311.pdf.

The latest information on BOP's vaccination efforts, including the number of

completed vaccinations at each institution, is available at

https://www.bop.gov/coronavirus/, and is updated every weekday.

**E.     H. pylori and USP Coleman II**

Sykes claims without support that there is an outbreak of H. pylori at USP

Coleman II caused by the contaminated water supply. According to information

provided to the undersigned AUSA from the Health Services Administrator at FCC

Coleman, there is no outbreak of H. pylori at FCC Coleman. And, according to the

Facilities Department Manager, FCC Coleman's water source is the public water

system which supplies the entire county of Sumter, Florida. There are no known

issues with the water system and H. pylori. According to BOP regional counsel,

the BOP also has never settled a tort claim related to an inmate (Reg. No. 72855-

054) becoming infected with H. pylori contracted from FCC Coleman's water

supply as Sykes claims in his motion. (ECF No. 202, PageID.1123).

According to the CDC, H. pylori is believed to be transmitted mainly

through fecal to oral or possibly oral to oral methods. *See*

https://wwwnc.cdc.gov/travel/yellowbook/2020/travel-related-infectious-

diseases/helicobacter-pylori. Roughly two-thirds of the world's population is

infected with H. pylori, which is usually asymptomatic and does not require

treatment. H. pylori infections are otherwise treated with antibiotics. *See*

- 11 -

https://www.uofmhealth.org/health-library/abh0960. H. pylori is also a major cause of stomach and upper small intestine ulcers. *Id.*

### III.    The Court should deny Sykes's motion for compassionate release.

Sykes's motion for a reduced sentence should be denied. A district court has "no inherent authority . . . to modify an otherwise valid sentence." *United States v. Washington*, 584 F.3d 693, 700 (6th Cir. 2009). Quite the contrary: a district court's authority to modify a defendant's sentence is "narrowly circumscribed." *United States v. Houston*, 529 F.3d 743, 753 n.2 (6th Cir. 2008). Absent a specific statutory exception, a district court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c). Those statutory exceptions are narrow. *United States v. Ross*, 245 F.3d 577, 586 (6th Cir. 2001). Compassionate release under 18 U.S.C. § 3582(c)(1)(A) is equally narrow.

*First*, compassionate release requires exhaustion. If a defendant moves for compassionate release, the district court may not act on the motion unless the defendant files it "after" either completing the administrative process within the Bureau of Prisons or waiting 30 days from when the warden at his facility received his request. 18 U.S.C. § 3582(c)(1)(A); *United States v. Raia*, 954 F.3d 594, 595-96 (3d Cir. 2020). Because this requirement is a statutory one and not judicially crafted, it is mandatory. *Ross v. Blake*, 136 S. Ct. 1850, 1856–57 (2016); *Island*

*Creek Coal Co. v. Bryan*, 937 F.3d 738, 751 (6th Cir. 2019). Sykes has failed to meet this statutory hurdle.

*Second*, even if a defendant exhausts, he must show "extraordinary and compelling reasons" for release. 18 U.S.C. § 3582(c)(1)(A). Neither the defendant's generalized fear of Covid-19, given his vaccination status, nor his unsubstantiated allegations about H. pylori satisfy this requirement.

*Third*, even if a defendant is eligible for compassionate release, the district court may not grant the motion unless the factors in 18 U.S.C. § 3553(a) support release. 18 U.S.C. § 3582(c)(1)(A); *United States v. Ruffin*, 978 F.3d 1000, 1008-09 (6th Cir. 2020). As at sentencing, those factors require the district court to consider the defendant's history and characteristics, the seriousness of the offense, the need to promote respect for the law and provide just punishment for the offense, general and specific deterrence, and the protection of the public. 18 U.S.C. § 3553(a). These factors weigh heavily against releasing Sykes.

### A.   The Court is barred from granting release because Sykes has not exhausted his administrative remedies.

The Court must dismiss Sykes's motion because he has not satisfied the exhaustion requirement for compassionate release under 18 U.S.C. § 3582(c)(1)(A). Until recently, only the Bureau of Prisons could move for compassionate release. The First Step Act of 2018 amended the statute, permitting

defendants to move for it too. First Step Act § 603(b), Pub. L. No. 115-319, 132 Stat. 5194, 5239 (Dec. 21, 2018).

But the provision permitting a defendant-initiated motion includes an exhaustion requirement. *Id.* A district court may not grant a defendant's motion for compassionate release unless the defendant files it "after" the earlier of (1) the defendant "fully exhaust[ing] all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf," or (2) "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility." 18 U.S.C. § 3582(c)(1)(A); *United States v. Alam*, 960 F.3d 831, 832 (6th Cir. 2020). As the Sixth Circuit held in *Alam*, this statutory exhaustion requirement is "a mandatory condition" that "must be enforced" when the government raises it. *Id.* at 832–36; *accord United States v. Raia*, 954 F.3d 594, 595–97 (3d Cir. 2020).

Section 3582(c)(1)(A) also means that an inmate may not move for compassionate release on a different ground than the one he raised during the administrative process. The whole point of § 3582(c)(1)(A)'s exhaustion requirement is to ensure that the Bureau of Prisons has the opportunity to evaluate and consider an inmate's request first, while allowing the inmate to seek relief in court if the Bureau of Prisons denies or fails to act upon the request. *Alam*, 960 F.3d at 835–36. So when "the factual basis in the administrative request and the motion before the court are different, a defendant does not satisfy the exhaustion

- 14 -

requirement because he does not give the BOP an opportunity to act on the request before [he] brings his request to the courts." *United States v. Asmar*, 465 F.Supp.3d 716, 719 (E.D. Mich. 2020); *accord United States v. Mogavero*, No. 15-00074, 2020 WL 1853754, at *2 (D. Nev. Apr. 13, 2020) ("Proper exhaustion necessarily requires the inmate to present the same factual basis for the compassionate-release request to the warden."); *United States v. Jenkins*, 2020 WL 1872568, at *1 (D. Neb. Apr. 14, 2020); *United States v. Valenta*, 2020 WL 1689786, at *1 (W.D. Pa. Apr. 7, 2020).

Furthermore, although district courts have split on this issue, the Seventh Circuit recently held that§ 3582(c)(1)(A) requires issue-specific exhaustion. In *United States v. Williams*, 987 F.3d 700 (7th Cir. 2021), the court opined that § 3582(c)(1)(A)'s exhaustion requirement more closely resembles the exhaustion requirement in the Prison Litigation Reform Act (PLRA). *Williams*, 987 F.3d at 703. The PLRA requires "proper exhaustion" of available administrative remedies in order to afford prisons an opportunity to address issues before they are brought to federal court. *Williams*, 987 F.3d at 703; *see* 42 U.S.C. § 1997e(a). Because an inmate cannot satisfactorily exhaust under the PLRA by filing a grievance on one ground and then suing in court on an unrelated ground, the court held that an inmate must raise the same issues in the Bureau of Prisons and federal court in order to exhaust under § 3582(c)(1)(A). *Williams*, 987 F.3d at 704.

The best reading of Sixth Circuit law is also that § 3582(c)(1)(A) requires issue-specific exhaustion. As the Sixth Circuit has explained, an exhaustion statute "written in more general terms" commands "issue exhaustion if an agency's rules so require." *Island Creek Coal Co. v. Bryan*, 937 F.3d 738, 746–47 (6th Cir. 2019) (citing *Woodford v. Ngo*, 548 U.S. 81, 90–91 (2006)); *accord Cuevas-Nuno v. Barr*, 969 F.3d 331, 334–35 & n.4 (6th Cir. 2020). Section 3582(c)(1)(A) is just such a statute, and the agency's rules here require an inmate to identify "[t]he extraordinary or compelling circumstances that the inmate believes warrant consideration" for compassionate release. 28 C.F.R. § 571.61(a)(1).

Thus, an inmate seeking relief based on Covid-19 must first make *that* specific request to the Bureau of Prisons before seeking relief in court. *Island Creek Coal Co.*, 937 F.3d at 746–47; *see Alam*, 960 F.3d at 834–36 (emphasizing the issue-specific nature of exhaustion under § 3582(c)(1)(A)).

Sykes did not comply with § 3582(c)(1)(A)'s mandatory exhaustion requirement. Sykes has only requested compassionate release previously for non-Covid-19 related reasons. *See* Defendant's Exhibit A. On July 14, 2021, the defendant submitted a request for compassionate release to the warden based only on BOP refusing to implement the First Step Act of 2018 and that USP Coleman II has confirmed cases of H. pylori and that he is experiencing symptoms of having H. pylori. *Id.* On August 30, 2021, the defendant filed this motion to for

compassionate release based on H. pylori and the Covid-19 pandemic. (ECF No.

202, PageID.1119). Thus, BOP never had the opportunity to consider

compassionate release based on the Covid-19 related reason. His motion for

compassionate release should therefore be dismissed for failure to exhaust. *Alam*,

960 F.3d at 836.

> **B.      There are no extraordinary and compelling reasons to grant Sykes compassionate release.**

Even if Sykes had exhausted his administrative remedies, compassionate

release would be improper because he has not satisfied the requirements for a

reduction in sentence.

> **1.   Governing Law**

The compassionate release statute, 18 U.S.C. § 3582(c)(1)(A), as amended

by the First Step Act on December 21, 2018, provides in pertinent part:

(c) Modification of an Imposed Term of Imprisonment.—The court may not modify a term of imprisonment once it has been imposed except that—

(1)  in any case—

(A)  the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—

(i)  extraordinary and compelling reasons warrant such a reduction . . .

and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

Further, 28 U.S.C. § 994(t) provides: "The Commission, in promulgating general policy statements regarding the sentencing modification provisions in section 3582(c)(1)(A) of title 18, shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples. Rehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason."[4]

The Sentencing Guidelines policy statement appears at § 1B1.13, and provides that the Court may grant release if "extraordinary and compelling circumstances" exist, "after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable," and the Court determines that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." Although the Sixth Circuit has concluded that this policy statement is not currently binding in connection with

---

[4]The inmate does not have a right to a hearing. Rule 43(b)(4) of the Federal Rules of Criminal Procedure states that a defendant need not be present where "[t]he proceeding involves the correction or reduction of sentence under Rule 35 or 18 U.S.C. § 3582(c)." *See Dillon v. United States,* 560 U.S. 817, 827-28 (2010) (observing that, under Rule 43(b)(4), a defendant need not be present at a proceeding under 18 U.S.C. § 3582(c)(2)).

motions filed by defendants, *see United States v. Elias*, 984 F.3d 516, 519 (6th Cir.

2021), the courts of appeals have recognized that it continues to provide important

"guideposts." *United States v. McGee*, 922 F.3d 1035, 1045 (10th Cir. Mar. 29,

2021); *see United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020) ("The

substantive aspects of the Sentencing Commission's analysis in § 1B1.13 and its

Application Notes provide a working definition of 'extraordinary and compelling

reasons'; a judge who strikes off on a different path risks an appellate holding that

judicial discretion has been abused.").

In application note 1 to the policy statement, the Commission identifies the

"extraordinary and compelling reasons" that may justify compassionate release.

The note provides as follows:

> 1. Extraordinary and Compelling Reasons.—Provided the defendant meets
> the requirements of subdivision (2) [regarding absence of danger to the
> community], extraordinary and compelling reasons exist under any of the
> circumstances set forth below:
>
> (A)   Medical Condition of the Defendant.—
>
>> (i)   The defendant is suffering from a terminal illness (i.e., a serious
>> and advanced illness with an end of life trajectory). A specific
>> prognosis of life expectancy (i.e., a probability of death within a
>> specific time period) is not required. Examples include
>> metastatic solid-tumor cancer, amyotrophic lateral sclerosis
>> (ALS), end-stage organ disease, and advanced dementia.
>>
>> (ii)   The defendant is—
>>
>>> (I)   suffering from a serious physical or medical condition,

(II)   suffering from a serious functional or cognitive impairment, or

(III)   experiencing deteriorating physical or mental health because of the aging process,

that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

(B)   Age of the Defendant.—The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

(C)   Family Circumstances.—

(i)   The death or incapacitation of the caregiver of the defendant's minor child or minor children.

(ii)   The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

(D)   Other Reasons.—As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

In general, the defendant has the burden to show circumstances meeting the test for compassionate release. *See, e.g.*, *United States v. Neal*, 2020 WL 5993290, at *4 (E.D. Pa. Oct. 9, 2020) (Gallagher, J.); *United States v. Adeyemi*, 2020 WL 3642478, at *16 (E.D. Pa. July 6, 2020) (Kearney, J.). As the terminology in the statute makes clear, compassionate release is "rare" and "extraordinary." *United States v. Willis*, 382 F. Supp. 3d 1185, 1188 (D.N.M. 2019) (Johnson, J.) (citations

omitted). That statutory requirement means that a defendant's reasons for release must satisfy two strict criteria. 18 U.S.C. § 3582(c)(1)(A)(i). The defendant's reasons must be "extraordinary"—meaning "'most unusual'" or "'far from common.'" *United States v. Hunter*, -- F.4th --, 2021 WL 3855665, at \*4 (6th Cir. Aug. 30, 2021). The reasons must also be "compelling"—meaning "'forcing, impelling driving.'" *Id.* A defendant must establish both criteria to satisfy the statute's eligibility threshold. Sykes has satisfied neither.

### 2.  H. Pylori and Compassionate Release

The defendant's claims regarding H. pylori at his BOP facility are wholly unsubstantiated. And even if Sykes were infected with H. pylori, and he were symptomatic, then he would be treated with antibiotics. H. pylori infection, unlike Covid-19 in an unvaccinated individual, does not present an increased risk of an adverse outcome such that it would present "a serious physical or medical condition….that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility." USSG § 1B1.13 cmt n.1(A)(ii)(I). As such, Sykes's claims regarding H. pylori cannot provide a basis for a sentencing reduction.

### 3.  COVID-19 and Compassionate Release

The fact of the COVID-19 pandemic, which poses a general threat to every non-immune person in the country, does not alone provide a basis for a sentence

reduction. And the threat of a vaccinated person is even less. The guideline policy statement describes specific serious medical conditions afflicting an individual inmate, not generalized threats to the entire population. The Third Circuit therefore held: "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020); *see United States v. Roeder*, 807 F. App'x 157, 161 n.16 (3d Cir. 2020) (per curiam) (not precedential) ("[T]he existence of some health risk to every federal prisoner as the result of this global pandemic does not, without more, provide the sole basis for granting release to each and every prisoner within our Circuit."); *see also United States v. Hegyi*, 2020 WL 7090710, at *2 (N.D. Ind. Dec. 4, 2020) (Van Bokkelen, J.) ("the presence of COVID-19 in a prison, even in large numbers, does not justify compassionate release on its own.").

Here, as it relates to the Covid-19 pandemic, the defendant is not eligible for compassionate release because he has not identified any condition that he currently has that is on the CDC's list of risk factors, or indeed any chronic medical ailment. The motion should therefore be denied. *See, e.g.*, *United States v. Williams*, 2020 WL 4001045, at *2 (E.D. Pa. July 14, 2020) (Bartle, J.) (denied for inmate who presents no health conditions); *United States v. Cato*, 2020 WL 4193055, at *2

(E.D. Pa. July 21, 2020) (Beetlestone, J.) (same); *United States v. Moore*, 2020 WL 4193012, at *1 (E.D. Pa. July 21, 2020) (Pappert, J.) (same); *United States v. Ramirez-Ortega*, 2020 WL 4805356, at *2 (E.D. Pa. Aug. 18, 2020) (DuBois, J.) (same); *United States v. Coles*, 2020 WL 1899562 (E.D. Mich. Apr. 17, 2020) (Drain, J.) (denied for 28-year-old inmate at institution with outbreak); *United States v. Haney*, 454 F. Supp. 3d 316 (S.D.N.Y. Apr. 13, 2020) (Rakoff, J.) (denied for 61-year-old with no other conditions).

Moreover, the defendant has received the Pfizer vaccine. That similarly precludes eligibility for compassionate release. *See, e.g.*, *United States v. Smith*, 2021 WL 364636, at *2 (E.D. Mich. Feb. 3, 2021) (Ludington, J.) ("absent some shift in the scientific consensus, Defendant's vaccination against COVID-19 precludes the argument that his susceptibility to the disease is 'extraordinary and compelling' for purposes of § 3582(c)(1)(A)."). As a result, the defendant's motion for compassionate release should be denied.

The defendant has received a vaccine approved by the FDA for emergency use based on its conclusion that, in extensive testing, the vaccine was 95% effective in preventing COVID-19 infection, including in participants with medical comorbidities associated with high risk of severe COVID-19 disease. *See* FDA Decision Memorandum, Pfizer – Dec. 11, 2020, https://www.fda.gov/media/144416/download.

Various studies continue to confirm the efficacy of the vaccines. For instance, on April 1, 2021, Pfizer reported its follow-up study on the 44,000 participants in its Phase 3 trial. It found that the vaccine, based on mRNA technology (like the Moderna vaccine), was 91.3% effective against COVID-19, measured seven days through up to six months after the second dose, across age, gender, race, and ethnicity demographics, across participants with a variety of underlying conditions, and during a period through March 13, 2021, when variants were circulating. Pfizer further found that the vaccine was 100% effective against severe disease as defined by the CDC and 95.3% effective against severe disease as defined by the FDA.

The CDC likewise recently reported the effectiveness of the Pfizer and Moderna vaccines in preventing infection during the same period, and concluded that its extensive data "reinforce CDC's recommendation of full 2-dose immunization with mRNA vaccines. COVID-19 vaccination is recommended for all eligible persons . . . ." "Interim Estimates of Vaccine Effectiveness," https://www.cdc.gov/mmwr/volumes/70/wr/mm7013e3.htm (Mar. 29, 2021).

Even more significantly, thus far, the vaccines are proving remarkably effective not just in limiting infection, but in fulfilling their most important purpose: limiting severe disease and death. The CDC tracks "breakthrough" infections after full vaccination. It states that as

of August 16, over 168 million people had been fully vaccinated with one

of the three approved vaccines, and among those people the CDC recorded 7,887

hospitalizations (1,828 of which were asymptomatic or not related to Covid), and

1,829 deaths (371 of which were asymptomatic or not related to Covid). That

means that the risk of death in this group after full vaccination, with a symptomatic

case of Covid-19, was about 1 in 115,000, a chance far below the ordinary

health risks commonly faced by inmates and all others.

"Now that Covid-19 vaccinations are being administered throughout the

Bureau of Prisons, compassionate release motions generally lack merit." *United

States v. Reed*, 2021 WL 2681498, at *4 (E.D. Pa. June 30, 2021) (Schmehl, J.);

*see United States v. Miller*, No. 13-20928, 2021WL 1115863, at *2 (E.D. Mich.

Mar. 24, 2021) ("The court is aware of no scientifically derived evidence showing

that severe complications or death from Covid-19 is likely, or even possible, after

an individual has received a full vaccination regimen. Over forty million

individuals have been fully vaccinated in the United States, and the court does not

know of a single confirmed death of a fully vaccinated individual from Covid-

19."). Recent decisions, including by this Court, overwhelmingly agree with that

vaccinated individuals do not present an "extraordinary and compelling reason" for

release based on risks from Covid-19. *See, e.g.*, *United States v. Collier*, 15-cr-

20074-1, 2021 U.S. Dist. LEXIS 76134, 2021 WL 1560079, at *2 (E.D. Mich.

Apr. 21, 2021) (Murphy, J.). And given that he has been vaccinated, Jackson's request based on Covid-19 likewise does not meet this high bar.

At this time, this Court's assessment should be driven by the prevailing scientific view that vaccination makes extremely rare, and possibly eliminates entirely, the risk of severe disease from the virus. As inmates are vaccinated, this unprecedented period, in which the threat of the virus sometimes gives rise to "extraordinary and compelling" circumstances, should come to an end, and sentence reductions based on medical conditions once again should be limited to extraordinary conditions that are terminal or severely limit an inmate's ability to function in a correctional setting. *See, e.g.*, *United States v. Willis*, 382 F. Supp. 3d 1185, 1188 (D.N.M. 2019) (Johnson, J.) (relief is "rare" and "extraordinary"); *United States v. Lisi*, 440 F. Supp. 3d 246, 251 (S.D.N.Y. 2020) (Failla, J.) ("a defendant's medical condition must be one of substantial severity and irremediability."); *United States v. Polnitz*, 2020 WL 1139836, at *2 (E.D. Wis. Mar. 9, 2020) (Pepper, J.) (must be extraordinary; "Many inmates suffer from pain and mental illness.").

For all of these reasons, compassionate release is not warranted here because Sykes's reasons for release are neither "extraordinary" nor "compelling."

C.     **The factors in 18 U.S.C. § 3553(a) strongly weigh against
       compassionate release.**

Even when an inmate has shown "extraordinary and compelling reasons," he

is still not entitled to compassionate release. The Court must consider the factors

set forth in 18 U.S.C. § 3553(a) and determine that release is appropriate before

relief can be granted. 18 U.S.C. § 3582(c)(1)(A). A defendant's failure to establish

that the § 3553(a) factors support relief is an independent basis for denying

compassionate release. *United States v. Ruffin*, 978 F.3d 1000, 1008–09 (6th Cir.

2020); *accord United States v. Austin*, 825 F. App'x 324, 325–27 (6th Cir. 2020)

(upholding a district court's denial of compassionate release based on the

§ 3553(a) factors); *United States v. Kincaid*, 802 F. App'x 187, 188–89 (6th Cir.

2020) (same). This Court's "initial balancing of the § 3553(a) factors during [the

defendant's] sentencing" is presumed to "remain[] an accurate assessment as to

whether those factors justify a sentence reduction". *United States v. Sherwood*, 986

F.3d 951, 954 (6th Cir. 2021). The defendant must therefore "make a compelling

case as to why the sentencing court's § 3553(a) analysis would be different if

conducted today." *Id.* Here, even if the Court were to find that Sykes established

extraordinary and compelling reasons for his release, the § 3553(a) factors should

still disqualify him.

Sykes fails to demonstrate how release, less than halfway through his 68

month sentence reflects the seriousness of the offense, promotes respect for the

law, and provides just punishment for the offense, especially given his criminal

history and demonstrated inability to abide by conditions set by the courts.

The defendant's offense is unquestionably serious. Sykes committed two

bank robberies just six weeks after being released from a 17-year prison sentence

for the same type of offense. Moreover, he was on federal supervised release in

two different cases when he committed these crimes. Sykes has demonstrated by

his unabated criminal behavior that he will not be deterred by restrictions and

conditions placed upon him by the courts or by lengthy prison sentences.

Defendant has been engaged in criminal activity for the majority of his adult life.

His prior convictions and probation violations demonstrate a lack of respect for

the law. This Court found just 10 months ago that a 60 month sentence was

warranted after careful consideration of the § 3553(a) factors. Nothing has

happened in the past 10 months that would warrant another reduction in sentence.

Further, Sykes has no viable release plan. And given that Sykes has proven

particularly recalcitrant in the past to following rules and authority, it may be

surmised that he will not regularly shelter and protect himself against the virus,

such that he would put the community at risk. Also, Sykes himself may be at the

same or greater risk if released. *See United States v. Keeling*, 2020 WL 6273978, at

*3 (D. Idaho Oct. 26, 2020) (Nye, C.J.) ("Multiple courts have denied

compassionate release to prisoners, even those with high-risk medical conditions,

because many of them would likely be less-exposed to the pandemic by remaining
at the prison.") (citing cases); *United States v. Merriweather*, 2021 WL 195371, at
\*8 (M.D. Tenn. Jan. 20, 2021) (Richardson, J.) (while there was a large outbreak at
the prison, there is also alarming spread in the community, and "[w]here a
defendant . . . has not been compliant in the past with applicable societal standards
and conditions of release, the Court cannot have confidence that such defendant
will 'play by the rules,' including the generally acknowledged 'rules' for
minimizing risk from COVID-19.").

The defendant continues to present a danger to the community, and should
be required to serve the sentence that this Court imposed for his criminal conduct.
Any reduction in sentence would not reflect the seriousness of the offense, promote
respect for the law, and provide just punishment for the offense. *See* 18 U.S.C.
§ 3553(a)(2)(A). A consideration of the factors above shows that release at this
point is inappropriate based on the offense of conviction, the defendant's lack of
significant medical conditions, and the amount of time remaining on the
defendant's sentence.

**Conclusion**

Upon consideration of all pertinent factors, the motion for compassionate release should be denied.

Respectfully submitted,

Saima S. Mohsin
United States Attorney

*/s/ Frances Lee Carlson*
FRANCES LEE CARLSON
Assistant United States Attorney
United States Attorney's Office
Eastern District of Michigan
211 West Fort Street, Suite 2001
Detroit, MI 48226
Phone: (313) 226-9696
Email: frances.carlson@usdoj.gov

Dated:  September 14, 2021

## Certificate of Service

I hereby certify that on September 14, 2021, I electronically filed the foregoing document with the Clerk of the Court using the ECF system.

I further certify that a copy of the foregoing document, including the sealed exhibits, were mailed by U.S. mail to the following non-ECF participant:

> **Dorian Trevor Sykes**
> **Registration No. 31185-039**
> **USP Coleman II**
> **P.O. Box 1034**
> **Coleman, FL 33521**

*/s/ Frances Lee Carlson*
FRANCES LEE CARLSON
Assistant United States Attorney

Dated:  September 14, 2021